UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

**Todd A. Johnson,**  Civil No. 12-1153 (DWF/JJG)

    Plaintiff,

v.  **REPORT AND RECOMMENDATION**

**Carolyn W. Colvin**,[1]

    Acting Commissioner of Social Security,

    Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Todd A. Johnson (Johnson) seeks judicial review of the denial of his application for disability insurance benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and is presently before the Court on cross-motions for summary judgment (Doc. Nos. 8, 17). For the reasons set forth below, the Court recommends that Johnson's motion for summary judgment be granted, and Defendant's motion for summary judgment be denied.

I.     **BACKGROUND**

Johnson filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on April 2, 2009, alleging a disability onset date of March 29, 2006, when he had a stroke at age 31. (R. 1114-120.)[2] Johnson was financially ineligible for SSI,

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm She is substituted as the defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

[2] The Court cites the administrative record in this matter, Doc. No. 7, as "R."

1

because he inherited twenty acres of land. (R. 46.) Therefore, to be entitled to DIB benefits, Johnson had to establish disability before his insured status expired on December 31, 2007. (R. 8.) Medical records before and after December, 2007 were part of the record. Obviously, the medical records between the date of his stroke and December 31, 2007 are significant to this review and will be summarized. However, medical records created after that should also be considered "because [the records] may bear upon the severity of the claimant's conditions before the expiration of his or her insured status." *Martonik v. Heckler*, 773 F.3d 236, 240 (8th Cir. 1985) (quoting *Basinger v. Heckler*, 725 F.2d 1166, 1169-70 (8th Cir. 1984)); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be awarded.'") (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)). Accordingly, the entirety of the picture painted by the records will be discussed.

Overall, Johnson's stroke caused vision problems, chronic face pain, and dizziness. (R. 150.) Johnson was self-employed as a farmer on his disability onset date. (R. 273.) In the past, Johnson had worked as a glazier, carpenter, and as a machine operator of a molding press. (R. 228.) Johnson testified at a hearing before an administrative law judge ("ALJ"), and the ALJ denied his disability claim on December 2, 2010. (R. 5-17.) The Appeals Council denied review, and Johnson filed this action for judicial review on May 14, 2012. (R. 1-4.)

### A. Medical Evidence Before the Date Last Insured

On March 28, 2006, Johnson had symptoms of a stroke, and he was admitted to St. Luke's Hospital the next day. (R. 259.) Johnson had otherwise been relatively healthy and admitted that he did not see doctors on a regular basis. (*Id.*) The findings from his neurological

examination included bilateral nystagmus,[3] vertical diplopia,[4] numbness with allodynia[5] on the left side of his face, 4/5 strength in the left leg, and dyesthesia[6] in the left arm and left leg. (R. 259-60.) When Johnson was discharged two days later, his final diagnoses were right upper brain stem infarct,[7] MRI evidence of left cerebellar ischemic event with possible stenosis of the left vertebral artery,[8] and hyperlipidemia.[9] (R. 261.) Johnson underwent occupational and physical therapy in the hospital, and at the time of discharge he could walk independently using a walker. (*Id.*) He continued therapy as an outpatient. (*Id.*)

In physical therapy on April 15, 2006, Johnson noted that his left arm and leg fatigued quicker than the right side. (R. 399.) He had to use his right arm to do farm activities. (*Id.*) The next week, he was having headaches more frequently, and the left side of his face was swollen and reddened. (R. 402-03.) His left side continued to fatigue quicker than his right. (*Id.*) In May, his headaches were constant. (R. 408, 410.) As part of his continued occupational therapy,

---

[3] Nystagmus is involuntary rapid movement of the eyeball. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1327 (31st ed. 2007).
[4] Diplopia is double vision. *Dorland's* at 532.
[5] Allodynia is pain from a non-noxious stimulus to normal skin. *Dorland's* at 52.
[6] Dyesthesia is distortion of any sense, especially touch. *Dorland's* at 584.
[7] Infarct is an area of cell death in a tissue, due to blood deficiency from obstruction of circulation in the area. *Dorland's* at 948. Brain stem stroke symptoms include vertigo, dizziness, imbalance, double vision, slurred speech and others. Brain Stem Stroke, American Heart Association, American Stroke Association, available at http://www.strokeassociation.org/STROKEORG/AboutStroke/EffectsofStroke/Brain-Stem-Stroke_UCM_310771_Article.jsp Brain stem strokes produce a wide spectrum of deficits and recovery. *Id.* A stroke can cause temporary or permanent disabilities, depending on how long the brain suffers lack of blood flow and which part of the brain is affected. Stroke, Complications available at http://www.mayoclinic.com/health/stroke/DS00150/DSECTION=complications
[8] The vertebral arteries are arteries in the neck that supply the brainstem with blood. *About Vertebral Artery Narrowing*, The University of Arizona, Dept. of Surgery, available at http://surgery.arizona.edu/patient-resource/about-vertebral-artery-narrowing The most common cause of narrowing in the vertebral artery is peripheral arterial disease. *Id.*
[9] Hyperlipidemia is a general term for elevated concentrations of any or all of the lipids in the plasma. *Dorland's* at 903.

on May 5, 2006, Johnson had low results for hand coordination. (R. 416, 420.) In therapy three days later, Johnson was dizzy and had another headache. (R. 416.) His doctor had told him that he may never get rid of his headaches or dizziness. (*Id.*) He was discharged from occupational therapy on May 15, 2006, although he would benefit from further services. (R. 417, 419.)

Johnson saw his new primary care physician, Dr. Christopher Thiessen at Gateway Family Health Clinic, on June 22, 2006. (R. 353-54.) Johnson asked Dr. Thiessen to complete paperwork for his disability claim. (R. 353-54.) Johnson reported that cold water on his arms and legs now caused sharp pain. (R. 354.) Pain was disrupting his sleep, but he only wanted medication if it would not interfere with using heavy machinery. (*Id.*) Dr. Thiessen opined that Johnson was disabled. (R. 353.)

Upon referral by Dr. Thiessen, Johnson had a consultation with Dr. Elizabeth Weinman on June 28, 2006. (R. 693.) Johnson's complaints included: left-sided body and face pain, right hip and leg numbness causing him to fall, and sharp left face pain thirty times a day. (R. 693-94.) He reported that Topamax was ineffective treatment for pain, and that he had nausea, double vision, pain behind his left eye, constant dizziness, and hypersensitivity to hot and cold, among other things. (*Id.*) Based on findings consistent with his report, Dr. Weinman recommended that Johnson continue occupational and physical therapy, remain off work, and no bow hunting until further recovery. (*Id.*)

Dr. Weinman referred Johnson for a psychological diagnostic interview with Dr. Douglas Heck on July 18, 2006. (R. 686.) Dr. Heck noted Johnson was applying for disability. (*Id.*) Johnson felt irritable and more easily frustrated since his stroke. (R. 689.) Johnson said he could live with his face pain, but it was difficult. (*Id.*) Dr. Heck was not yet sure whether Johnson would be able to return to work from a cognitive or a physical standpoint. (R. 690.) He

diagnosed provisional cognitive disorder, NOS and alcohol abuse. (R. 691.) The next day, Johnson saw Dr. Upali Aturaliya at Relf Eye Associates, and reported reduced vision and pain in the back of his left eye. (R. 251.) Dr. Aturaliya wanted to wait at least six months to see if there was any spontaneous recovery in Johnson's vertical muscle palsy before considering surgery. (*Id.*)

Dr. Weinman also referred Johnson to a neurologist, Dr. Gary Beaver. (R. 305-06.) Dr. Beaver diagnosed trigeminal neuralgia,[10] and prescribed Trileptal for pain. (R. 306.) The next day, Johnson saw Dr. Weinman and complained of facial twitching, left-sided face pain, occasional left ear pain, heaviness on the left side of his body, difficulty walking when fatigued, and a feeling that his left leg would give out. (R. 695.) On physical examination, Johnson's balance was mildly impaired, and he again had a reduction in left leg strength. (*Id.*) Two months later, Johnson told Dr. Weinman his condition was unchanged. (R. 696.) Due to his poor balance, he had fallen and had bruises and a bump on his head. (*Id.*) On examination, his Romberg test was positive,[11] and his gait was impaired. (*Id.*) Dr. Weinman recommended physical therapy. (*Id.*)

On September 5, 2006, Dr. Thiessen noted Johnson's improvement was slow, and he had a wide range of problems from his stroke. (R. 352.) His most prominent symptoms were vertigo and left-sided incoordination. (*Id.*) Dr. Thiessen completed a medical opinion form for Johnson, opining that Johnson was disabled and never expected to recover. (R. 673.) Dr. Thiessen renewed his opinion in December 2006. (R. 674.) In the meantime, Johnson asked Dr. Thiessen to support his application for a crossbow permit for hunting. (R. 350-51.) Dr. Thiessen wrote,

---

[10] Trigeminal pertains to the fifth cranial nerve, and neuralgia is pain extending along the course of a nerve. *Dorland's* at 1992, 1281.
[11] Positive Romberg test or sign is an increase in clumsiness of all movements and uncertainty of gait when the patient's eyes are closed. *Dorland's* at 1922.

"[h]is left arm is weak and responds slowly to motion. This amount of impairment would make him unable to use a bow." (R. 351.)

On November 30, 2006, Johnson told Dr. Beaver that Trileptal had helped his pain, but he had breakthrough pain. (R. 307.) Johnson's gait was mildly unsteady, but he had full strength in all extremities, with the exception of trace hip flexor weakness. (*Id.*) Dr. Beaver increased the Trileptal. (*Id.*) Johnson told Dr. Weinman the following week that he continued to have occasional sharp left ear pain, pain in his face and right leg aggravated by cold, and imbalance. (R. 697.) He declined further physical therapy as he had difficulty finding transportation. (*Id.*)

On December 26, 2006, Dr. Thiessen noted Johnson had been doing fairly well apart from a single episode of headache, and his problems were stable. (R. 348.) Dr. Thiessen recommended continued rehabilitation and neurology evaluations. (R. 349.) The next record from Dr. Thiessen is a form he completed for Johnson's CUNA Mutual insurance claim. (R. 675-76.) Dr. Thiessen checked boxes on the form to indicate that Johnson was totally disabled. For example, he indicated that Johnson could work only four hours per week, stand with breaks for two hours per day, and sit with breaks for eight hours per day. (*Id.*) Dr. Thiessen diagnosed brainstem cerebrovascular accident ("CVA").[12] (R. 676.)

On May 18, 2007, Dr. Thiessen noted that Johnson's stroke symptoms were stable. (R. 346.) Specifically, he wrote, "[h]e continues to have no difficulty with motion, vision and pain. Currently he is having some pain and stiffness in his neck." (*Id.*) Johnson returned in September 2007 for a cholesterol check, and for completion of insurance paperwork. (R. 344.)

---

[12] Dr. Thiessen continued to provide disability medical opinion forms for Johnson through May 2010. (R. 677-79, 682, 684.)

B.  **Medical Evidence After the Date Last Insured**

About two months after the insurance cut-off date, Johnson told Dr. Thiessen there was no change in his stroke symptoms. (R. 341-42.) Then in August 2008, Dr. Beaver noted that while Johnson had been doing well overall for the last six or eight months, he was now having increased pain in his face. (R. 309.) Johnson also reported increased fatigue, poor mood, anxious state, and irritability. (*Id.*) Dr. Beaver prescribed Effexor. (*Id.*) Two months later, Johnson was less irritable since starting Effexor, and his stroke symptoms were stable. (R. 334-36.) Ultimately, he was unable to tolerate the side effects of Effexor and switched to Prozac. (R. 315.)

On October 29, 2008, Johnson went to St. Luke's Hospital after having an episode of blurred vision, difficulty walking, and slurred speech. (R. 266.) His EKG was abnormal and suggestive of possible ischemia, but his MRI was negative. (R. 263, 279.) Johnson was diagnosed with transient ischemic attack ("TIA"). (R. 267.) Johnson saw Dr. Beaver in follow up on December 18, 2008. (R. 315-16.) Trileptal was no longer effective for his pain. (R. 315.) Dr. Beaver prescribed gabapentin but did not discontinue Trileptal. (*Id.*)

Johnson went to St. Mary's Medical Center on January 29, 2009, for worsening face pain, which had become unbearable. (R. 290, 292.) Johnson's CT and MRI brain scans were normal. (R. 290-91.) Johnson reported that his left facial pain started after his 2006 stroke. (R. 285.) He had sharp exacerbations of pain a few times a day, lasting ten to fifteen seconds. (*Id.*) He also said he had a constant headache for the last few weeks. (*Id.*) On examination, his left face looked reddish from rubbing. (*Id.*) Dr. Mostafa Farache stated, "the presence of a headache associated with the facial pain and the family history of headaches raises concern for trigeminal [headache], which can explain the constant headache and the facial pain. . ." (*Id.*) Upon

discharge on January 31, Dr. Manaf Zaizafoun prescribed M.S. Contin and liquid morphine for pain, and recommended follow up with a pain clinic. (R. 289.)

On February 3, 2009, Dr. Beaver noted that Johnson had scabbing on the left side of his face from grabbing his face due to pain. (R. 318-19.) Dr. Beaver refilled Johnson's morphine and prescribed Lyrica. (*Id.*) Six weeks later, Johnson had stable stroke symptoms, but was still suffering pain. (R. 363.) He was already on a maximum dose of Lyrica, so he was prescribed Nortriptyline. (*Id.*)

To deal with the pain symptoms, Dr. Thiessen referred Johnson to Duluth Clinic's pain program. (R. 666.) There, on March 19, 2009, Johnson reported daily left-sided facial, head and neck pain with skin sensitivity. (R. 666-67.) He was more active lately because he was trying to complete construction of his house. (R. 667.) However, he found it very frustrating because he no longer had his former stamina, and activity exacerbated his pain, resulting in fatigue and frequent need for rest periods. (R. 668.) His depression was moderate and anxiety was mild. (*Id.*) Johnson followed up in April, after completing his occupational and physical therapy evaluations. (R. 658-60.) Pain and insomnia kept him awake at night, and he tried to nap for an hour during the day. (R. 658.) His family helped him with yard work. (R. 659.) He could tolerate sitting for sixty minutes, standing for five minutes, and walking fifty yards. (*Id.*)

On June 25, 2009, Johnson again complained of fatigue, face pain, dizziness, tremors, left leg weakness, and increased side effects from medication. (R. 652.) Johnson withdrew from the Duluth Clinic pain program on July 21, 2009, because he was having a hard time finding transportation to the appointments, and he did not want to do pool therapy because water caused electric-like shock in his body. (R. 634.)

8

Then, Johnson went to the Mayo Clinic and saw Dr. John Graner and Dr. Stefan Dupont on September 8, 2009. (R. 505.) Johnson had knee pain for several months, and nausea, heartburn and fatigue every day. (*Id.*) Johnson also reported that since his 2006 stroke, he had intermittent left facial pain and vertigo. (R. 498-501.) He had a constant aching and burning sensation involving the entire left side of his face, and intermittent sharp pain lasting up to one minute, about twenty times a day. (R. 498.) Medications did not relieve his pain. (*Id.*) On examination, he had left-sided stroke residuals. (R. 500.) Dr. Dupont diagnosed posterior circulation stroke, likely secondary to vertebral dissection.[13] (*Id.*)

The next week, Johnson saw Dr. P. Sandroni at Mayo Clinic. (R. 494-95.) Johnson reported having a constant aching face pain, with superimposed episodes of stabbing severe pain up to twenty times a day, pretty much unchanged since his stroke. (R. 494.) Dr. Sandroni performed a limited examination and noted Johnson had a very dense sensory loss on his face, and to a lesser extent in his arms, and even lesser in his leg. (R. 495.) Dr. Sandroni recommended that Johnson taper his pain medications. (*Id.*) She diagnosed central pain syndrome secondary to brain stem stroke,[14] and found Johnson to be a good candidate for

---

[13] Vertebral artery dissection is uncommon but is the leading cause of stroke in young and otherwise healthy patients. Kwan-Woong Park, M.D., Jong-Sun Park, M.D., Sun-Chul Hwayng, M.D., Soo-Bin Im, M.D., Won-Han Shin, M.D., and Bum-Tae Kim, M.D., *Vertebral Artery Dissection: Natural History, Clinical Features and Therapeutic Considerations*, J. Korean Neurosrug Soc., 2008 September; 44(3): 109-115, available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2588305/ The term dissection implies a tear in the wall of a major artery leading to the intrusion of blood within the layers of an arterial wall, leading to formation of a hematoma. *Id.*

[14] Central pain syndrome is a neurological condition caused by damage to or dysfunction of the central nervous system, which includes the brain, brain stem, and spinal cord. NINDS Central Pain Syndrome Information Page, National Institute of Neurological Disorders and Stroke, National Institutes of Health, available at http://www.ninds.nih.gov/disorders/central_pain/central_pain.htm The syndrome can be caused by stroke; and pain is typically constant, and may be moderate to severe in intensity, often aggravated by touch, movement, emotions and temperature changes. (*Id.*) Individuals

multicortex stimulation. (*Id.*) Dr. Sandroni wrote, "[h]e tried to remain active but, obviously, between the pain and the incoordination, he is completely disabled." (*Id.*)

On November 23, 2009, Dr. S. Sampson evaluated Johnson for a mood disorder, and diagnosed recurrent mild depression and central chronic pain syndrome. (R. 474-78.) Dr. Sampson was also concerned that Johnson was more anxious than he was aware. (R. 475.) Because Prozac was less likely to target pain, Dr. Sampson felt a dual-mechanism anti-depressant such as Effexor would be better for Johnson. (R. 477.) Dr. Sampson noted that untreated depression can worsen an individual's pain. (*Id.*) The next day, in screening for Mayo Clinic's Pain Rehabilitation Center, Johnson reported that he spent his days taking care of his home and looking after his son. (R. 471-72.)

Johnson visited Nurse Mindi Aho at Gateway Clinic on May 14, 2010, before beginning the Mayo Clinic pain program. (R. 602.) He was stable but did not have relief of his face pain from Lyrica or Effexor. (*Id.*) Nurse Aho noted Johnson's limitations included trouble with lifting, carrying, and walking, primarily due to lack of coordination. (*Id.*) She refilled his oxycodone and morphine. (*Id.*) Johnson then began Mayo Clinic's three week pain program. (R. 460.) Johnson said his face pain occurred ten to fifty times a day for up to twenty seconds, causing him to pull on his skin until he bled. (*Id.*) He also suffered persistent aching of his entire head with fatigue, weakness, numbness, poor sleep, impaired mobility, depressed mood, anxiety, and blurred vision almost daily. (R. 461.) Johnson further described his symptoms and functional limitations: hot and cold water caused him pain, he had difficulty walking and used a cane, he did not drive much due to blurred vision, he was irritable, he could not go hunting or

---

experience one or more types of pain, including brief, intolerable bursts of sharp pain similar to the pain caused by a dental probe on an exposed nerve. (*Id.*) Central pain syndrome may be delayed by months or even years, especially if it is related to post-stroke pain. (*Id.*)

play catch with his son, and he was no longer socializing. (R. 462-63, 468.) After tapering off opioids, he would be a candidate for multicortex stimulation. (R. 461.)

On June 14, 2010, Johnson was discharged from the Mayo Clinic pain program. (R. 533-37.) Dr. W. Michael Wooten noted when Johnson began the program his pain was persistent, he was on chronic opioid maintenance, and his quality of life and level of functioning were profoundly affected. (R. 533.) Johnson was able to improve his endurance, strength, flexibility and overall aerobic conditioning in the physical therapy program. (R. 534.) For example, he was compliant with biking or walking once a day for forty minutes, which was considered an appropriate level for him. (R. 558.) He was also tapered from oxycontin. (*Id.*) On July 6, 2010, Johnson told Nurse Mindi Aho that he was doing much better coping with pain after treatment at Mayo, but his pain was still present. (R. 599.)

### C. State Agency Consultant Medical Opinions

Dr. Aaron Mark reviewed Johnson's social security disability file on initial consideration of his application for disability benefits on June 9, 2009. (R. 429-31.) The instructions provided to Dr. Mark stated, "[w]e only need 3/29/06- 12/31/07 assessed." (R. 431.) Dr. Mark opined that Johnson had the residual functional capacity to lift and carry twenty pounds occasionally, and ten pounds frequently; stand and/or walk six hours in an eight-hour day; sit for six-hours in an eight-hour day; never climb ladders, ropes or scaffolds; occasionally balance; and avoid even moderate exposure to hazards. (R. 433-39.) Dr. Charles T. Grant reviewed Johnson's social security disability file on reconsideration of Johnson's application for benefits on August 12, 2009. (R. 443-45.) Dr. Grant was informed that when the claim was considered initially, the SSA had all of the records up to the DLI [date last insured], so there were no new records to obtain. (R. 444.) Dr. Grant affirmed Dr. Mark's RFC opinion. (R. 444-45.)

11

### D. Administrative Hearing

Johnson testified at the administrative hearing on November 1, 2010. (R. 20-21.) He was a single father with custody of his 12-year-old son. (*Id.*) He had not worked since having his stroke. (R. 22-23.) He owned cattle jointly with his neighbors, but gave up caring for the cattle about six months after his stroke. (R. 40-41.)

Johnson described the residuals from his stroke that affected his ability to work. (R. 23-24.) He had sharp pain caused by temperature changes, particularly when showering. (R. 40.) He lacked fine leg motor skills, making it difficult to place his left leg where he wanted. (R. 36.) His left arm felt heavy, and he needed a break after using his left hand for fifteen minutes because his arm got tired, and his face pain "kicked in." (R. 30-31.) Johnson could only perform tasks for about an hour before he had to sit and rest. (R. 31.) He became fatigued and had to rest after walking 100 yards. (R. 37.) Johnson thought he could be on his feet two or three hours a day. (*Id.*) He did not think he could perform a "sitting job," because he could not sit for long periods. (R. 32.) He would be unable to use his hands for eight hours, and he would need breaks every fifteen to twenty minutes. (R. 32-33.) Johnson only drove when he had to because it caused motion sickness. (R. 35.)

Johnson's face pain became severe twenty to thirty times a day, lasting from five to twenty seconds. (R. 33.) When that happened, he had to stop what he was doing and wait it out. (*Id.*) Apart from these episodes, he had constant pain that caused headaches, blurred vision and dizziness. (*Id.*) On days when his pain was unbearable, he isolated and tried to stay calm. (R. 34.) This occurred two or three times a week, preventing any activities. (R. 34-35.) In his best month since the year 2006, he had at least six bad days. (R. 35.) Pain and sleep apnea interfered with his sleep. (R. 37-38.) He spent three to four hours a day lying down. (R. 38.)

Trileptal helped a little at first, but not for long. (R. at 39.) His physicians recommended that he taper his use of narcotics so he could undergo brain stimulation to treat his face pain. (R. 24-25.)

The ALJ posed a hypothetical question to the vocational expert, assuming a person who could lift twenty pounds occasionally, ten pounds frequently; sit and stand for six hours in a day; never climb ladders, ropes or scaffolds; "only occasional unbalanced postural," otherwise frequent, and avoid even moderate exposure to hazardous machinery and heights. (R. 28.)[15] The VE said Johnson performed the job of molding press operator as light work. (*Id.*)

### E. ALJ's Decision

The ALJ found Johnson had the residual functional capacity for light work, as defined in 20 C.F.R. § 404.1567(b), with additional limitations of occasional balancing, no climbing ladders or ropes, and no work at heights or near hazards or hazardous machinery. (R. 11.) The ALJ did not place controlling weight on Dr. Thiessen's RFC opinion because it was "not consistent with or supported by objective findings." (R. 14.) The ALJ noted that Johnson was "lost to neurologic care" from November 2006 through August 2008, suggesting his neurological problems may not have been significant. (*Id.*) In August 2008, Johnson reported doing well the last six to eight months, but he had some increased facial pain. (*Id.*) On examination, his gait and strength were normal. (*Id.*)

The ALJ claimed to place appropriate weight on the non-examining opinions of state agency consultants, and that "the weight of the current record" supported his RFC finding. (*Id.*) The ALJ noted that Johnson may have experienced increased problems in 2008 and 2009, but his date last insured was December 2007. (*Id.*) The ALJ found Johnson's overall functioning to be inconsistent with disability. (R. 15.) In this regard, the ALJ noted Johnson engaged in some

---

[15] The ALJ posed several additional hypothetical questions to the VE, but ultimately relied on the VE's testimony in response to the first hypothetical question. (R. 29, 44-45, 49, 51.)

"cattle/farming work." (*Id.*) The ALJ noted that when Johnson asked about pain medication in June 2006, he did not want medication that interfered with using heavy machinery. (*Id.*) The ALJ found it inconsistent that Johnson was applying for disability in September 2006, but he also sought a crossbow hunting permit. (*Id.*) Based on the VE's response to his hypothetical question, the ALJ concluded Johnson could perform his past light work as a molding press operator. (R. 15-16.)

## II.    STANDARD OF REVIEW

To receive SSI benefits, an individual must be found disabled as defined by the Social Security Act and accompanying regulations. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C § 423(d)(1)(A). It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a decision denying social security benefits, courts examine whether the findings and conclusion of the ALJ are legally sound and "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citation omitted). "In assessing the substantiality of the evidence," courts must consider evidence that detracts from the Commissioner's decision, as well as evidence that supports it. *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004). If substantial evidence

in the record supports a finding of disability, the court may reverse and remand for an order granting benefits. *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000).

## III. DISCUSSION

Johnson raises three issues in support of his motion for summary judgment. Because this Court finds the ALJ made two errors in his evaluation, the Court need not reach Johnson's third argument.

### A. Past Work

Johnson contends the record as a whole shows he had decreased endurance for standing and difficulty walking, contrary to the ALJ's finding that he could stand and/or walk six hours per day, and thus, perform his past work as a molding machine operator. Johnson asserts the ALJ's reliance on a non-examining physician's opinion is misplaced because the physician did not have all of the medical records available for review. The Court agrees. A nonexamining physician's opinion, particularly when it is inconsistent with a treating physician's opinion, generally does not constitute substantial evidence of the claimant's RFC. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). Although the ALJ should weigh the evidentiary value of a nonexamining physician's opinion, one important factor is the degree to which a nonexamining physician has considered all of the pertinent evidence in the claim. 20 C.F.R. § 404.1527(c)(3). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be awarded.'" *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)).

The state agency consulting physicians, Drs. Mark and Grant, were instructed that they did not need to review Johnson's medical records created after his insured status expired in December 2007. Evidence from the Mayo Clinic after Johnson's date last insured indicates that

15

Johnson had not recovered from his post-stroke pain. Even if his leg strength and ability to walk improved, chronic face pain could also impair his ability to perform work requiring standing or walking for six hours every workday. If the state agency physicians and the ALJ had considered Johnson's medical records after December 2007, they would have found evidence that Johnson tried to remain active and live with his pain but it became unbearable, he ultimately required narcotic pain medication, and then a pain rehabilitation program to get off narcotic pain medication, so he could be treated with multicortex stimulation. For this reason, the ALJ erred in granting great weight to the nonexamining state agency physicians's opinions that Johnson could perform light exertional work.[16]

Although the ALJ erred in finding Johnson could perform his past work of molding machine operator, the Court must determine whether the ALJ's alternative finding of Johnson's ability to perform sedentary work is supported by substantial evidence in the record as a whole. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("[t]o show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred); 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.00(a) ("the functional

---

[16] Moreover, the Court finds another reason Johnson could not perform his past light work as a molding machine operator. The VE testified that a hypothetical person who could perform the light work could perform Johnson's past relevant work as a molding machine operator. However, the VE did not testify that this work could be performed by someone who, according to the hypothetical question, had to avoid exposure to hazards or hazardous machinery. According to the Dictionary of Occupational Titles ("DOT"), a molding machine operator sets up and operates injection-molding machines to case products from thermoplastic materials. DOT Code 556.382-014 available at http://www.occupationalinfo.org/55/556382014.html . This involves regulating high temperatures on the machine, removing finished products, and sometimes using a knife to trim the molded product. Operating a molding machine, by definition, involves hazards or hazardous machinery. *Id.* Although the VE raised the issue of hazards, the ALJ gave no explanation for finding Johnson's past work did not involve work around hazards or hazardous machinery. Therefore, the ALJ's determination that Johnson could perform his past relevant work is not supported by substantial evidence in the record.

capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.") The ALJ posed the following hypothetical question to the VE: "assume . . . that you had an individual of his age, educational background and work history . . . [limited to] unskilled sedentary; brief and superficial contact with the public or supervisors; low stress, routine repetitive type work at a sedentary exertional level." (R. 29.) The VE identified sedentary bench assembly jobs that such a person could perform. The Court must address Johnson's allegations that he could not perform sedentary work on a full-time competitive basis due to pain.

B.     Credibility

The ALJ did not credit Johnson's subjective complaints of disabling face pain. Johnson argues he had significant problems with pain from November 2006 through August 2008. Johnson did not see Dr. Beaver between November 2006 and August 2008. When Johnson returned to Dr. Beaver in August 2008, Dr. Beaver noted Johnson had been doing well overall in the last six to eight months. Johnson asserts he continued to see Dr. Thiessen and take medication for pain during this period. He claims the record as a whole indicates that, since his stroke, he continuously had intermittent severe pain that would interrupt any activity. Johnson contends his pain would preclude him from working at an average pace, and would cause him to miss three or more days of work per month.

Shortly after Johnson had a stroke, he was told that he may never get rid of his headaches or dizziness. In September 2006, Dr. Thiessen opined Johnson was disabled and never expected to recover. The ALJ commented on only one of Johnson's medical records dated after December 2007, an August 2008 record showing Johnson had been doing well overall for the past six to eight months, but he now had increasing facial pain. Residual stroke symptoms can be

17

permanent, and central pain syndrome can begin months or even years after a stroke. *See supra* notes 7 and 14.

Johnson testified that in his best month since 2006, he had at least six days when his face pain was unbearable. The fact that his stroke symptoms were described as stable for a period of time does not mean Johnson's exacerbations of pain were not debilitating. *See Martonik* 773 F.2d at 239 (fact that symptoms were intermittent did not preclude finding of disability because claimant must be able to perform requisite physical acts of work day in and day out.) For example, in March 2009, Dr. Beaver described Johnson's stroke symptoms as stable, but noted Johnson was in pain despite his use of morphine.

Furthermore, the ALJ did not discuss any of the records of Johnson's treatment at Mayo Clinic, stating only:

> The undersigned recognizes that the claimant may have experienced increasing problems residuals of CVA in 2008 and 2009; however, based on his date last insured this evaluation considered the evidence to December 31, 2007.

(R. 14). The ALJ erred by not considering whether the records after the date last insured shed light on Johnson's condition during the insured period. Records from Mayo Clinic indicate that Johnson's pain worsened to an unbearable level in 2008 and 2009, but the records also indicate Johnson had intermittent severe shooting pains in his face before his insured status expired in December 2007. The ALJ relied on the fact that Johnson did not want to take pain medication that would interfere with him operating heavy machinery and that he sought a permit for hunting soon after his stroke, but Johnson testified that he gave up cattle farming six months after his stroke. The fact that a person who was young and had been healthy before his stroke tried to continue his farming work and hunting after the stroke does not mean his level of pain was not credible.

18

And the fact that Johnson did not see a neurologist from the end of December 2006 through August 2008, without the benefit of considering the later medical records, does not support a finding that Johnson could have performed full-time competitive employment during that period. When Johnson had a stroke at age 31, he admitted that he did not regularly seek medical treatment. Consistent with his past behavior, Johnson did not seek neurologic care from the end of 2006 through mid-2008, and the ALJ discounted Johnson's subjective complaints of post-stroke pain largely on that basis. Although Johnson's chronic head pain responded to Trileptal in 2007 and part of 2008, in later medical records Johnson reported that he *continuously* had multiple daily exacerbations of shooting pain in his face.

Dr. Sandroni aptly described Johnson's condition stating "[h]e tried to remain active but, obviously, between the pain and the incoordination, he is completely disabled." Subsequently, in the Mayo Clinic pain program, Johnson tapered off opioid medications and learned to better live with his pain. However, his pain did not go away. The ALJ's reliance on Johnson's stable stroke symptoms and temporary improvement in pain was misplaced. The record as a whole is consistent with Johnson's allegations that chronic pain would preclude him from performing full-time competitive employment at an average pace, without an impermissible number of absences from work due to his pain. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001) (the record as a whole corroborated the claimant's subjective complaints "in such a qualitative manner as to negate the inconsistencies pointed out by the ALJ.") Therefore, the ALJ's decision should be reversed, and Johnson should be awarded benefits as of March 29, 2006. *See id.* (where claimant established disability, it is unnecessary to remand for further proceedings except to award benefits).

## IV. CONCLUSION

Being duly advised of all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1. Plaintiff's motion for summary judgment (Doc. No. 8) be granted.

2. Defendant's motion for summary judgment (Doc. No. 17) be denied.

3. The case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for an award of benefits as of March 29, 2006.

4. If this Report and Recommendation is adopted, that judgment be entered accordingly.


Dated this 19th day of August, 2013.       s/ *Jeanne J. Graham*
                                            JEANNE J. GRAHAM
                                            United States Magistrate Judge


## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **September 4, 2013**. A party may respond to the objections within fourteen (14) days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which an objection is made.